IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF WEST VIRGINIA

HUNTINGTON DIVISION

UNITED STATES OF AMERICA,

        Plaintiff,

v.                                       CIVIL ACTION NO. 3:07-0470

$13,963.00, MORE OR LESS,
IN UNITED STATES CURRENCY,

        Defendant.

**ORDER**

Pending before the Court is the Government's Motion for Summary Judgment and for a Final Order of Forfeiture [doc. no. 12], and numerous motions by Donald Jamal Wilson, as an interested party. For the following reasons, the Court **GRANTS** the Government's motion and **DENIES** all of Mr. Wilson's motions.

**I.
FACTS**

On August 1, 2007, the Government filed a Verified Complaint of Forfeiture in Rem seeking to forfeit currency found on Mr. Wilson on the basis that the money was furnished or intended to be furnished in exchange for a controlled substance or constitutes proceeds traceable to such an exchange or was used or intended to be used to facilitate one or more violations of the Controlled Substance Act, 21 U.S.C. §§ 801 *et seq.* On that same day, the Clerk of this Court issued a Warrant of Arrest *in rem* and Notice to Potential Claimants pursuant to Rule G(3)(b)(i), Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions. On August 9, 2007, Mr. Wilson, together with his co-defendants in criminal action number 3:07-0034, were

served with the Verified Complaint of Forfeiture and the Warrant in Arrest *in rem* and Notice to Potential Claimants. On August 16, 2007, the United States Marshals Service executed the Warrant of Arrest *in rem* on the defendant currency. Mr. Wilson and the others were instructed to file a verified claim within 35 days of service and an answer to the Complaint within 20 days of filing their claims. The Government also published legal notice in the local newspaper on August 6, 13, and 20, 2007. The only person to file anything was Mr. Wilson, and he has the only outstanding claim.

On August 24, 2007, Mr. Wilson filed a "Petition to Mitigate Forfeiture and Return of Seized Property" and "Notice to Contest Forfeiture of Seized Property." [Doc. No. 7]. In those documents, Mr. Wilson claims that he obtained the money by legitimate means. Upon receipt of the filing, the Government sent Mr. Wilson a letter stating that it was construing his "Notice to Contest Forfeiture" as a claim and it reminded him to timely file with an answer or the Government may seek default against his interest in the currency. Mr. Wilson never filed an answer.

On February 8, 2008, the Government sent interrogatories and a request for a production of documents to Mr. Wilson to determine his claim that the money was earned through legitimate means. As outlined in more detail below, Mr. Wilson basically responded that he had some rental income, got a loan for $3,500, sold some furniture, and he took a trip to Las Vegas. He also attached copies of a variety of documents, including: a deed and mortgage papers for some property he purchased in Detroit, Michigan; 1099 forms from 2003 to 2005 showing rent being paid by the Detroit Housing Commission to "Amaiha's Real Estate Investments" and receipts for rent

from individuals in 2005 and 2006; W-2 forms from 2003; a paystub from 2006; numerous receipts presumably for expenses he paid to upkeep his rental property; airline tickets to Las Vegas in January of 2006; and a "Travel Memo" regarding his trip to Las Vegas.

The Verified Complaint of Forfeiture in Rem sets forth the factual basis for the forfeiture. As the only challenge Mr. Wilson made to these facts in his "Petition to Mitigate Forfeiture and Return of Seized Property" and "Notice to Contest Forfeiture of Seized Property" is to paragraph 8(g), that the money came from legitimate sources, the Court deems the remaining undisputed allegations made by the Government as admitted by Mr. Wilson. *Fed. R. Civ. P.* 8(b)(6) (providing, in part, "[a]n allegation–other than one relating to the amount of damages–is admitted if a responsive pleading is required and the allegation is not denied"). These allegations are as follows:

> 8. The facts giving rise to the forfeitability of the currency are as follows:
>
> (a) Between August 4, 2006 and August 7, 2006, members of the Huntington Police Department Drug Unit (hereinafter HPD) were conducting video surveillance of an apartment located at 826 Rear Jefferson Avenue, Huntington, Cabell County, West Virginia, after receiving numerous complaints related to high drug activity occurring at the apartment. During this time period, HPD determined that Herbert Fordham, also known as "HB", and Donald Jamal Wilson, also known as "Cash," were present at the address. HPD had received prior information that Fordham and Wilson were involved in the distribution of narcotics in the Huntington area. During the course of this surveillance, HPD observed a high volume of traffic coming in and out of the residence.
>
> (b) On August 7, 2006, members of the Drug Unit stopped an individual shortly after he/she exited the residence. A search of this person revealed that he/she was in possession of crack cocaine. HPD further received information from a cooperating individual

(hereinafter CI) that the CI had purchased marihuana from 826 Rear Jefferson Avenue and had observed scanners and scales to weigh drugs inside the residence.

(c) On August 8, 2006, members of the HPD Drug Unit, West Virginia State Police and Huntington Violent Crimes Drug Task Force executed a state search warrant at 826 Rear Jefferson Avenue. Upon entry into the residence, investigators located approximately 160 grams of crack cocaine and 58 packs of heroin in a closet. A field test was conducted on the crack and heroin which resulted in positive alerts for narcotics for both substances.

(d) Also on August 8, 2006, the landlord of 826 Rear Jefferson Avenue was interviewed and confirmed that the apartment was rented by Donald Jamal Wilson, and a second CI confirmed that Donald Jamal Wilson was residing at the residence at the time the search warrant was executed. HPD obtained three felony arrest warrants for Donald Jamal Wilson for possession with intent with regard to the crack and heroin seized from his residence on this same date.

(e) On October 20, 2006, a CI advised the HPD that Donald Jamal Wilson was in the Huntington area distributing crack cocaine and was driving a white 4-door Pontiac with Ohio registration.

(f) On October 27, 2006, members of the HPD Drug Unit observed Donald Jamal Wilson driving a white 2000 4-door Pontiac, VIN 1G2NF52T4YC513615, bearing Ohio registration DYN-6834, nearing Huntington, Cabell County, West Virginia. Efforts were made by HPD Drug Unit to have Wilson pulled over for a traffic violation. Soon after Wilson was spotted by HPD, Wilson crossed over the 17th Street bridge into the State of Ohio. Efforts were immediately begun to have Ohio authorities conduct a traffic stop on Wilson regarding the three felony warrants from West Virginia. The Scioto County Ohio Sheriff's Department pulled Wilson over on U.S. Route 23 North, Lucasville, Scioto County, Ohio, near mile post 12. A search incident to arrest revealed $13,963.00 on Wilson's person. The currency was partially bound by rubber bands and contained in various denominations. The vehicle was also searched incident to Wilson's arrest and officers found a set of digital scales in the trunk of the vehicle. The scales were field tested and revealed trace amounts of cocaine. Donald Jamal Wilson was arrested on felony drug charges and taken to the Scioto County Sheriff's Department for booking.

\* \* \*

>9. On or about February 14, 2007, a federal grand jury sitting in the Southern District of West Virginia at Charleston returned a one-count indictment against Wilson charging him with maintaining a "crack house" in violation of 21 U.S.C. § 856(a)(2), in United States v. Donald Jamal Wilson, Criminal No. 3:07-00034 (USDC SDWV).
>
>10. On April 17, 2007, a federal grand jury sitting in the Southern District of West Virginia at Huntington returned an eight-count superseding indictment against Wilson, Herbert Fordham, Bryant Holloway and Rashard Wilson. The superseding indictment charged all four defendants with conspiracy to distribute more than 50 grams of crack cocaine and cocaine; defendant Holloway with two counts of distribution of crack cocaine and one count of being a felon in possession of one or more firearms; defendant Donald Jamal Wilson with maintaining a crack house on two separate occasions; and defendant Fordham with one count of distribution of crack cocaine. . . .

*Verified Complaint of Forfeiture In Rem*, at ¶¶ 8 - 10, in part.

On September 5, 2007, the federal grand jury returned an eight-count second superceding indictment, adding defendant Fiasili Fitisemanu Bartram. All of Mr. Wilson's co-defendants pled guilty to various charges.[1] On November 14, 2007, the federal grand jury returned a third superceding indictment solely against Mr. Wilson, charging him with Conspiracy to Distribute More than 50 Grams of Cocaine Base, a Quantity of Cocaine, and a quantity of heroin from in or about 1998, to on or about January 16, 2007, in violation of 21 U.S.C. § 846, and two counts of maintaining a crack house in violating 21 U.S.C. § 856(a)(2). On December 13, 2007, he

---

[1] Rashard Wilson and Herbert Fordham pled guilty on October 29, 2007, and November 6, 2007, respectively, to Conspiracy to Distribute More than 50 Grams of Cocaine in violation of 21 U.S.C. § 846. Bryant Holloway pled guilty on November 13, 2007, to Distribution of Cocaine Base in violation of 21 U.S.C. § 841(a)(1). Fiasili Fitisemanu Bartram pled guilty on November 6, 2007 to Conspiracy to Distribute More than 50 Grams of Cocaine Base in violation of 21 U.S.C. § 846.

was convicted by jury of all counts and he was subject to an enhancement pursuant to 21 U.S.C. § 851. On March 24, 2008, Mr. Wilson was sentenced by this Court to life without release as to the conspiracy charge and 240 months each as to the § 856(a)(2) charges, to run concurrently with each other and the conspiracy charge.

## II.
## DISCUSSION

To obtain summary judgment, the moving party must show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *Fed. R. Civ. P.* 56(c). In this case, it is the Government's initial burden to show "the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Rule 56(c)). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

Pursuant to he Civil Asset Forfeiture Reform Act of 2000 ("CAFRA"), 18 U.S.C. § 983(c)(1), the Government must demonstrate by a preponderance of the evidence that the property sought is subject to forfeiture.[2] Furthermore, § 983(c)(3) provides that "if the Government's theory of forfeiture is that the property was used to commit or facilitate the commission of a criminal offense, or was involved in the commission of a criminal offense, the Government shall establish

---

[2]CAFRA applies to all forfeiture cases filed after August 23, 2000.

that there was a substantial connection between the property and the offense." In order to meet its burden, "the Government may use evidence gathered after the filing of a complaint . . . ." 18 U.S.C. § 983(c)(2).

In the context of civil forfeitures, courts have found this burden is met and summary judgment is appropriate where a claimant drug dealer fails to show that money seized was derived from legitimate sources. For instance, in *United States v. Funds in the Amount of Thirty Thousand Six Hundred Seventy Dollars*, 403 F.3d 448 (7th Cir. 2005), the Seventh Circuit affirmed a decision by the lower court granting summary judgment in favor of the Government where the claimant drug dealer had filed for Chapter 7 bankruptcy and his tax returns from the date of his bankruptcy until the date the cash was seized showed that his expenditures were greater than his income. 403 F.3d at 452-53, 468. Similarly, in *United States v. $174,206.00 in U.S. Currency*, 320 F.3d 658 (6th Cir. 2003), the Sixth Circuit affirmed the forfeiture decision of the lower court based, in part, upon the fact that claimant drug dealers' tax records showed a total income of $31,142, but $174,206.00 was found in safe deposit boxes and there was no evidence of other legitimate sources of income or innocent ownership. 320 F.3d at 662. *See also United States v. $141,770*, 157 F.3d 600, 604 (1998) ("[S]tatement that . . . [the] money constituted legitimate business proceeds is undercut both by . . . [the claimant's] inability to produce any tax records regarding the source of this income and by his initial denial of ownership over the money.").

Upon review of the facts of this case, the Court also finds the Government has meet its burden. As previously mentioned, Mr. Wilson did not file an answer to the Verified Complaint

to contest any facts other than the money being derived from legitimate means. At the time of his arrest, officers found digital scales in his vehicle which contained trace amounts of cocaine base and the money at issue was found on his person. The money was partially bound in rubber bands and contained in various denominations. In support of its Motion for Summary Judgment, the Government submitted an affidavit by Detective Paul Hunter of the HPD and Huntington Violent Crimes and Drug Task Force in which he states: "I personally observed the currency and saw that it consisted of multiple bills in small denominations, which in my experience is consistent with the manner by which drug traffickers carry their money." *Affidavit of Paul Hunter*, at ¶3, in part. Detective Hunter also averred that:

> 5. That the investigation has revealed that while sometimes Wilson would obtain controlled substances from sources in Huntington to re-sell, Detroit was the primary if not sole outside source for Wilson to obtain drugs for resale in the Huntington area;
>
> 6. That Donald Jamal Wilson told arresting officers that he was enroute to Detroit on October 27, 2006;
>
> 7. That the sum of seized currency is consistent with what a one-half kilo of cocaine would cost and it was believed by law enforcement officers that Wilson may have been enroute to Detroit on October 27, 2006, to purchase additional controlled substances[.]

*Id*. at ¶¶ 5-7. The Court finds this evidence, together with the fact that Defendant was convicted of operating crack houses and conspiracy to knowingly and intentionally distribute large amounts of cocaine base and quantities of cocaine and heroin from 1998 through 2007 in the Huntington area,

easily satisfies the Government's burden to demonstrate by a preponderance of the evidence that the there is a substantial connection between the money and the offense and the money is subject of forfeiture.

In addition, the Court finds that Mr. Wilson has failed to create a genuine issue of material fact that the money was obtained through legitimate sources. Mr. Wilson stated in a handwritten letter to the Government that he did not file tax returns for tax years 2002 through 2006 because he "didn't have a 'Tax I.D. No.' for . . . [his] business." *Letter from Donald Jamal Wilson to Betty A. Pullin* (dated Feb. 28, 2008). He further states that he received a loan in August 2006 from Quanada Real for $3,500 and sold some furniture to another individual in September 2006 for $3,500 to $4,000. He attached various documents showing other revenue sources, which include:

1) Rental income to Amaiha's Real Estate Investments[3] from the Detroit Housing Authority in 2003 for $9,508.00, in 2004 for $11,295.00, and in 2005 for $895.00, for a total of $21,698.00.

2) W-2 forms from Lattas Group Financial in 2003 show income in the gross amount of $491.00 and from Staffpro V, LLC in 2003 in the gross amount of $1,740.13. He also included a paystub from Standard Concrete & Trucking for the pay period from April 1, 2006 to April 7, 2006, in the gross amount of $560.00, with a total gross for the year of $1,680.00. Mr. Wilson claims he worked for Standard Concrete throughout the summer of 2006. Assuming this to be true, the Court multiples his weekly salary of $560.00 by 24 weeks (from April 7, 2006 to September 23, 2006), for a gross total of $13,440. Thus, the total gross salary from 2003 through 2006 could have been as high as $17,351.13[4] ($491.00 + $1,740.13 + $1,680.00 + $13,440).

---

[3]"Amaiha's Real Estate Investments" apparently is the name by which Mr. Wilson operated his rental property.

[4]The Court notes that deductions were made from Mr. Wilson's paystubs for social security, taxes, etc. However, the Court cannot calculate the total of those deductions from his potential gross

3)     Receipts for rent paid totaling $5,900. The receipts are for various months ranging from August 3, 2005, to October 3, 2006. However, there are not receipts for eight of the months between those dates. If the Court assumes that Defendant received rent during those months at a rate of $600 per month, which appears to be the monthly rent, Mr. Wilson may have received an additional $4,800, for a total potential rent of $10,700.

Adding these very liberal calculations in favor of Mr. Wilson together, the Court finds his potential total income from 2003 through 2006 was $57,249.13. Although the Court will use this figure, the Court recognizes that Mr. Wilson in no way has established that he had this much income during this period.

Mr. Wilson also submitted evidence that he had expenses during this period of time. There expenditures include:

1)     A mortgage statement from New Century Mortgage Corporation dated January 14, 2003, shows a principle balance on his rental property as $55,225.02, with a monthly total payment of $480.79, due on February 1, 2003. A statement from PCFS Mortgage Resources from January 17, 2004, shows Mr. Wilson made $2,403.95 in regular mortgage payments due from August 1, 2003 through December 1, 2003. It can be presumed from this statement that Mr. Wilson also made his regular mortgage payments from February 1, 2003, through July 1, 2003, making the total amount of payments in 2003 $5,288.69.

2)     The mortgage statement from PCFS Mortgage Resources also shows a payment due of $1,726.39. This figure includes his payment due from January 1, 2004 and February 1, 2004, and some late and

---

salary because the Court does not have sufficient information to do so as it does not have paystubs for the entire pay period. Nevertheless, even if the Court considers his potential gross salary, the Court finds for the reasons to follow that this amount is insufficient to support Mr. Wilson's claim.

    miscellaneous fees.  Mr. Wilson attached two Western Union payment receipts of $600 made out to PCFS Mortgage Resources.[5]

3)  A statement from Litton Loan Servicing LP dated May 13, 2005, shows a principal balance of $54,241.79, with a payment due of $774.87.[6]  This appears to be his regular loan payment due May 1, 2005, plus an escrow amount due.  Thus, as there does not appear to be a balance due on this statement, the Court presumes that Mr. Wilson paid the $1,726.30 payment due PCFS, which included his February 1, 2004 payment, and the fourteen regular payments due from that date through April 1, 2005, making his total payments $8,457.36 ($480.79 x 14 months + $1,726.30).

4)  There are two Western Union payment of $480.79 and $480.78 dated June 15, 2005, and November 9, 2005, respectively, that appear to be made to Litton Loan.  As those payments seem to be regular mortgage payments,  the Court assumes that Mr. Wilson was making his payments throughout this entire period (June through November) and paid the $774.87, due May 1, 2005, for a total of $3,659.60 ($480.79 x 4 months + $774.87  $480.79 + $480.78).

5)  Mr. Wilson contends that he was going to use the money at issue to make improvements to his rental property.  Therefore, the Court assumes that he continued making his regular mortgage payments from December 2005 up to the time of his arrest in October 2006.  Otherwise, the Court would dismiss Mr. Wilson's argument without going any further because it would be totally unbelievable to this Court that he was taking the cash to Detroit to make improvements on a property that already was subject to foreclosure.[7]  Thus, the amount of regular mortgage payments Mr. Wilson would have made during this period total $4,807.90 ($480.79 x 10 months).

6)  Mr. Wilson also attached receipts apparently for various improvements he made to his rental property.  Many of the receipts

---

[5] One of the receipts is undated the other receipt is dated February 9. 2004.

[6] The street address of the property subject to the lien is the same for all three companies. The Court assumes that PCFS Mortgage Resources took over the loan and/or payments previously owed and/or made to New Century and Litton Loan Serving LP took over the loan and/or collections for PCFS Mortgage Resources.

[7] The Government attached a property transaction record which shows the property was foreclosed upon and sold in March of 2007.

>are not legible. The Court finds the amount of expenditures on the receipts that it can decipher amounts to $2,432.96. Some of those receipts have returns marked on them. Again, it is difficult to read the amount of those returns, but they do not appear to be in significant amounts and would not affect this Court's ultimate decision.[8]

Totaling all these calculations together, the Court finds that Mr. Wilson paid $22,213.55 in regular mortgage payments and at least $2,432.96 in improvements to his rental property for a total of $24,646.51. Subtracting this amount from his maximum potential income of $57,249.13, leaves $32,602.62. If the Court then subtracts the $13,963 in cash seized in this case, it leaves Mr. Wilson only with $18,639.62 for all his other expense from 2003 through September of 2006. Dividing this number by the 45 months that this time period represents, it leaves Mr. Wilson with $414.21 per month. From this amount, Mr. Wilson also would have paid all his living expenses and his rent on the two properties he was convicted of maintaining as crack houses. One of those properties was operated as a crack house from in or about 2004 to on or about August 8, 2006. The other property was used from July of 2005 to on or about October 27, 2006. The Court finds that these expenditures alone likely would have far exceeded his maximum potential monthly income.

Moreover, in a letter dated November 10, 2003, from The CIT Group/Consumer Finance, Inc., it appears that Mr. Wilson had another mortgage. It is unclear from the letter whether this was a primary mortgage or a home equity line of credit and upon what property the mortgage was attached, but it shows an unpaid principal in the amount of $108,481.86. In the corner of the letter is a handwritten note that the current payment is $2,565.45. Mr. Wilson attached an undated

---

[8]In addition, Mr. Wilson attached a Quickcash receipt in the amount of $578. The Court does not know the significance of this receipt and does not count it either as income or an expenditure.

Western Union payment in the amount of $855.00 to The CIT Group/ Consumer Finance, Inc. and an undated MoneyGram in the amount of $575.00 to Allstate Financial Group.[9] Although the Court cannot say with certainty that this was the amount Mr. Wilson always paid on this mortgage or for how long he paid on this mortgage, it is clear that the mortgage existed and that he made at least some payments on it. It is inconceivable to this Court that Mr. Wilson would have been able to make his payments on this mortgage given his legitimate income.

## III.
## CONCLUSION

Given the circumstances detailed above of the seizure of $13,963 and Mr. Wilson's maximum potential legitimate income and his minimum expenditures, the Court finds that the Government clearly established by a preponderance of the evidence that the property is forfeitable under CAFRA and there is a substantial connection between the money and Mr. Wilson's drug activities. Although the Court finds Mr. Wilson did have some legitimate sources of income, that income was inadequate to pay his expenses and account for the nearly $14,000 in cash he had on him in September 2006. Thus, the Court finds Mr. Wilson fails to offer evidence that raises a genuine issue of material fact with respect to the money being subject to forfeiture and connected to his drug activities. Accordingly, the Court **GRANTS** summary judgment in favor of the Government [doc. no. 12].

---

[9]The Court is unsure for what account the payment to Allstate Financial Services was made, but it was copied on the same page at the payment to The CIT Group/Consumer Finance, Inc. Regardless whether or not it was applied towards this mortgage, it shows that Mr. Wilson had additional expenditures for which he had insufficient legitimate income to pay.

The Court also has reviewed the litany of other motions submitted by Mr. Wilson, namely: Request for Leave to Report Criminal Acts [doc. no. 14]; Motion to Dismiss for Failure to State a Claim [doc. no. 16]; Request Demand for Return of Creditor Property [doc. no. 17]; Request Demand Cease-and-Desist Order [doc. no. 18]; Request for Validation [doc. no. 19]; Petition for Protection Restraining and Injunction [doc. no. 20]; Motion to Produce the Underwriting Bond Warrant Bond and Defendant for a Full Transactional Audit and Examination by the Creditor/Claimant [doc. no. 32]; and Motion for Default Judgment Against the Plaintiff [doc. no. 35]. The Court **DENIES** all of these motions as being completely without merit. The Court also **DENIES as moot** Claimant's Request for Status of Case [doc. no. 10].

The Court **DIRECTS** the Clerk to send a copy of this written Opinion and Order to counsel of record and any unrepresented parties.

ENTER: October 13, 2009

ROBERT C. CHAMBERS
UNITED STATES DISTRICT JUDGE